**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | | |
|---|---|---|
| JTL CONSULTING, LLC, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | CIVIL ACTION NO. |
| | : | 1:04-CV-3459-JOF |
| MELWOOD E. MENDENHALL, | : | |
| | : | |
| Defendant, | : | |
| | : | |
| v. | : | |
| | : | |
| LOCKTON COMPANIES, INC., | : | |
| and SEAN MURPHY, | : | |
| | : | |
| Third-Party Defendants. | : | |

**OPINION AND ORDER**

This matter is before the court on Plaintiff's motion to compel [86-1]; Third-Party

Defendants Sean Murphy and Lockton Companies, Inc., and Plaintiff JTL Consulting, LLC's

motion for a protective order [87-1]; Third-Party Defendants Sean Murphy and Lockton

Companies, Inc., and Plaintiff JTL Consulting, LLC's  motion for leave to file excess pages

[94-1]; Third-Party Defendants Sean Murphy and Lockton Companies, Inc., and Plaintiff JTL

Consulting, LLC's  motion for partial summary judgment [95-1]; Defendant's motion for leave

to file excess pages [107-1]; and Third-Party Defendants Sean Murphy and Lockton

Companies, Inc., and Plaintiff JTL Consulting, LLC's   motion for leave to file excess pages [112-1].

## I.      Background

### A.      Procedural History

Plaintiff, JTL Consulting, LLC, incorporated in Delaware with its principal place of business in Missouri, filed suit on December 4, 2004, against Defendant Melwood E. Mendenhall, a citizen of Georgia and a former member of JTL, contending that Mr. Mendenhall impermissibly retained approximately $155,000 in capital that should have been returned to JTL.   Mr. Mendenhall answered and filed a counterclaim asserting that JTL failed to pay commissions promised to him and improperly charged him certain expenses.   At the same time, Mr. Mendenhall filed a third-party complaint against Lockton Benefits of Georgia and Sean Murphy, citizens of Georgia, asserting causes of action of fraud and misrepresentation and breach of contract.   Mr. Murphy is the President of Lockton Benefits of Georgia and also a member of JTL.

### B.      Facts

Plaintiff, JTL Consulting, LLC, is a limited liability company whose members are insurance agents.   The agents are called "producers" and essentially are consultants who bring business to the Lockton Companies, Inc., which is an insurance broker.   Prior to 1994, the producers were employees of Lockton.   After 1994, JTL was formed and all of the Lockton agents became members of JTL.   Defendant, Mel Mendenhall, is a former member of JTL.

2

JTL's business is governed by an Operating Agreement originating on December 31, 1993, with an amendment in 1998. Each Lockton office also has a Consulting Agreement with JTL. Finally, JTL has numerous policies which are contained in the JTL Handbook. When a new member joins JTL, he does so by means of an Additional Member Agreement. The Additional Member Agreement refers to both the Operating Agreement and the Consulting Agreement. The Additional Member Agreement is a customized document and is not identical for all new members.

The members of JTL earn commissions on revenues generated from the placement of insurance. Generally, under the terms of the Operating Agreement, the commission rate is based on the profitability of the Lockton office for which the JTL member provides consulting services. At the beginning of the year, each Lockton office makes an estimate of the commission rate based on that office's actual revenues and expenses. At the end of the fiscal year, the estimate is reconciled with the actual budget numbers. The member's commission is based on his share of the revenue generated from the sale of insurance.

Each member of the JTL is paid a monthly draw. This draw is an advance against future commissions earned by the member. Pursuant to the Operating Agreement, the Consulting Agreement, and JTL's policies, there are certain expenses that are charged to the members. Each member is responsible for paying direct business expenses personally incurred in producing insurance business.

3

JTL maintains a "capital account" for each of its members.   The account tracks the member's commission income and expenses.   Commissions are credited to the capital account, and expenses, including draws, are debited to the capital account.

In January 2002, Lockton opened a new office in Atlanta called Lockton Benefits of Georgia ("Lockton Georgia").   At that time, a Consulting Agreement was entered into between Lockton Georgia, JTL, and the three JTL members who would be providing services to Lockton Georgia, including Sean Murphy.   The three JTL members also each signed an Additional Member Agreement at that time.

Beginning in November 2001, Mr. Mendenhall and Sean Murphy discussed Mr. Mendenhall joining the Lockton Georgia office.   As a matter of context, it appears from the record that Mr. Mendenhall had the ability to bring a very large client, Centennial Health, an owner and operator of nursing homes, to Lockton for insurance placement, and this made him a valuable recruit for the company.   These discussions continued between January 2002 and July 2002 with both Sean Murphy and Don Brain, the President of Lockton Benefits Group, and included a commission rate of 42.5% for Mr. Mendenhall.   Mr. Mendenhall testified that there was never a discussion about when or if that commission rate might end.   Rather, Mr. Mendenhall testified, all parties understood that the commission rate would be in "perpetuity." Mr. Mendenhall also believed that because Lockton Georgia had only recently opened, Lockton agreed to pay all the office's expenses for forty months.   Mr. Mendenhall believed

these expenses included all salaries, draws, air travel, expenses of staff, and day-to-day account management.

Mr. Mendenhall verbally committed to joining Lockton Georgia and began working to produce insurance business for Lockton on July 15, 2002. It is undisputed that Mr. Mendenhall chose not to take a draw at this time, although the parties disagree about his motivation. In any event, Mr. Mendenhall determined that he had sufficient income from other sources and did not want to "complicate" matters until commissions from the Centennial Health client started to roll in.

In August 2002, Mr. Mendenhall learned that Tim Noonan, a JTL member in the Los Angeles Lockton office, had previous experience placing insurance for nursing home operators. Mr. Mendenhall met with Mr. Noonan and introduced him to the Chief Financial Officer of Centennial Health. Thereafter, Mr. Noonan and another producer from Lockton's Los Angeles office, Mark Carlin, worked on the Centennial Health account. Mr. Mendenhall believed that Mr. Noonan and Mr. Carlin were simply "staff" of Lockton, whose expense would be borne by the company. In September 2002, Mr. Mendenhall was informed by Mr. Carlin and Mr. Noonan that he would need to split the Centennial Health commission with them. Although Mr. Mendenhall did not believe he should have to split the commission, he eventually agreed to do so.

In October 2002, Mr. Murphy suggested that Mr. Mendenhall should begin taking a draw. Mr. Mendenhall testified that he spoke with Mr. Brain about the draw because Mr.

AO 72A
(Rev.8/82)

Mendenhall "wanted to make perfectly clear [] I would not owe this money back to the company." *See* Mendenhall Depo., at 149.  He asked Mr. Brain what would happen if he were to accumulate a deficit in his account.  *Id.*  Mr. Brain responded, "[W]e don't allow a producer to get in that kind of trouble.  If you don't produce business, we're not going to allow this thing to get out of hand.  You will be terminated."  *Id*.  He also said, "it's a nonrecourse draw." *Id.*

On November 1, 2002, Mr. Mendenhall received an Additional Member Agreement to sign.   Mr. Mendenhall testified that he might have received a draft Additional Member Agreement prior to this date, but he could not recall for certain.[1]  When asked why he had to sign an Additional Member Agreement with JTL, Mr. Murphy told Mr. Mendenhall, "this is how we work here."   Mr. Mendenhall testified, "Up until this point, I wasn't really sure whether I had to, you know, work for this entity mentioned in this agreement or whether I could just continue on with my Lockton arrangement.  I wasn't sure this was a requirement, but he came to me and said, You have to do this.  In order to get paid, you've got to do it; so

---

[1]Movants contend that Mr. Mendenhall first received a copy of this document in July or August 2002.  Obviously, on Movants' motion for summary judgment, the court must accept Mr. Mendenhall's testimony on this point.  Movants correctly note, however, that while Mr. Mendenhall testified in his affidavit that he was never presented with a draft of the Additional Member Agreement prior to November 2002, his deposition testimony allows that he might have, but simply cannot remember.  The court further notes that Mr. Murphy's affidavit attaches several e-mails from Mr. Mendenhall which would seem to indicate that Mr. Mendenhall received a draft prior to November 2002, and perhaps even as early as August 2002.  Because this fact issue is not material to any of the legal issues before the court at this time, the court need not address it further.

I signed it."  *See* Mendenhall Depo., at 84.  Mr. Mendenhall was unfamiliar with JTL, but Mr. Murphy told him that it was an entity designed for tax benefits.  *See* Mendenhall Depo., at 140.

Mr. Mendenhall testified that his primary concern was the 42.5% commission rate. When Mr. Murphy presented him with the Additional Member Agreement, Mr. Mendenhall read the document.  He noticed an April 30 date on the document.  "The main thing I wanted to make clear with Sean [Murphy] is this doesn't affect my 42-and-a-half percent.  I was concerned about that because there was a date on here that said April 30[th].  I wanted to make sure they weren't going to monkey around with me.  I said, Does this affect the 42-and-a-half percent? And he said no.  That was critical."  *See* Mendenhall Depo., at 96.  Mr. Mendenhall also testified that he believed Mr. Murphy asserted that the April 30 date was "just getting it on the fiscal year."  *Id*. at 129.  This discussion took place before Mr. Mendenhall signed the Additional Member Agreement.  Mr. Mendenhall testified that he did not have any discussions with Mr. Brain or Mr. Murphy about deficits prior to signing the Additional Member Agreement.  No written materials were exchanged between the parties prior to the presentation of the Additional Member Agreement.

Mr. Mendenhall testified that he was particularly focused on the commission rate and that the remaining terms of the Additional Member Agreement "was sort of noise to me."  *See* Mendenhall Depo., at 128.  More fully, Mr. Mendenhall testified that he did not understand what section 4(a) of the Additional Member Agreement meant,

7

> [B]ecause, once again, and I hate to be redundant, but it's true.  I was getting 42-and-a-half percent, and that is what I understood.  I didn't understand all the debit and draw.  Not only did I not understand it then, but it was apparent to me pretty early on that none of the other people there . . . understood it either.

*Id.*  "At the time we were doing this, the only thing that I wanted to make clear was that I got 42-and-a-half percent.  The rest of it was sort of noise to me."  *Id.*  Mr. Mendenhall signed the Additional Member Agreement on November 1, 2002.

Mr. Mendenhall did not specifically ask for a copy of the Operating Agreement or the Consulting Agreement before signing the Additional Member Agreement.  Rather, "at some point," Mr. Mendenhall noticed the reference in the Additional Member Agreement to the Operating Agreement, and he asked Mr. Murphy and Mr. Brain for a copy of the agreements, but neither had copies and indicated they had never read them.  *See* Mendenhall Depo., at 119-20.  He did view a copy of the Operating Agreement after he signed the Additional Member Agreement.  Mr. Mendenhall received a copy of the JTL Handbook in December 2002.

Both the Operating Agreement and the Consulting Agreement contain merger clauses.

12.4.  <u>Entire Agreement</u>.   Except as may be set forth in the Consulting Agreement among the Company, a Client and Members and any other written agreements, this Agreement contains the entire agreement and understanding among the parties hereto with respect to the terms herein referred to, and no representations, promises, agreements or understandings, written or oral, not herein contained shall be of any force or effect.

12.5.  <u>Amendment</u>.   Except as otherwise expressly provided elsewhere in this Agreement, this Agreement shall not be altered, modified or changed except by a written document duly executed by all Members at the time of such alteration, modification or change.

Operating Agreement, §§ 12.4-12.5.

> 8.05 <u>Entire Agreement</u>.  Except as may be set forth in the Operating Agreement of JTL and other written agreements, this Agreement contains the entire agreement and understanding by and between Client, JTL and the Members with respect to the matters herein referred to, and no representations, promises, agreements or understandings, written or oral, not herein or therein contained shall be of any force or effect.  No change or modification hereof shall be valid or binding unless the same is in writing and signed by the party intended to be bound.

Consulting Agreement, § 8.05.

Pursuant to the Additional Member Agreement, Mr. Mendenhall made a $200 capital contribution to JTL and became an Executive Vice President of Lockton Georgia.  The Additional Member Agreement directly incorporates the Operating Agreement and the Consulting Agreement.  *See* Additional Member Agreement, § 2 ("Except as otherwise provided in this Agreement, Member agrees to be bound by all the terms and conditions of the Operating Agreement and Consulting Agreement."); Recital A ("Company is governed by an Operating Agreement by which Member has agreed to abide ("Operating Agreement"), and the parties have entered into a Consulting Agreement ("Consulting Agreement")); § 13 ("Except as provided above, the provisions of the Operating Agreement and the Consulting Agreement when applied to Member shall remain unaffected.").

Under the terms of the Operating Agreement, JTL members earn commissions on revenues from their placement of insurance.   In the Operating Agreement, the rate of commission is based on the profitability of the Lockton office to which the JTL member is

assigned.  *See* Operating Agreement, § 4.3.  At the beginning of the year, each Lockton office establishes its estimated rate of commission based on the office's budget of estimated revenues and expenses.  *Id.*  At the end of the fiscal year (April), the final commission rate is established based on the actual revenues and expenses.  *Id.*  The members' commissions are then re-calculated.  *Id.*

The Additional Member Agreement signed by Mr. Mendenhall also contains a provision dealing with his commissions which acts to modify the terms of the Operating Agreement:

> 7.    The following subparagraph (iv) shall be an addendum to Subsection 4.3(b) of the Operating Agreement, but not a substitution for any provision therein, and Company agrees to abide by the following subparagraph (iv) with respect to Member:
>
> (iv)   Notwithstanding anything in this paragraph (b) to the contrary, for the period commencing November 1, 2002 and ending April 30, 2003, the total sum of the benefits expense percentage plus 10% shall not exceed 57.5% and, accordingly, Member's share of Fee Income produced by Member shall be at least 42.5% during such period.

*See* Additional Member Agreement, § 7.

The Operating Agreement contains provision 7.1(c) which states, "[e]xcept as otherwise provided herein, no Member with a negative balance in such Member's Capital Account shall have any obligation to the Company or any other Member to restore said negative balance to zero."  *Id.*  Mr. Mendenhall, Mr. Murphy, and Mr. Brain all believed this

provision meant that a member would not owe anything back to JTL if they have a deficit in their capital accounts.

The JTL Handbook describes the types of expenses that will be charged to producers. *See* Handbook, at 77-78, 84, 96-98.  Expenses that do not fit into these descriptions "will be subject to the judgment of the Executive Committee." *Id.* at 96.  The Consulting Agreement provides that the Executive Committee of Lockton Georgia must be made of at least two-thirds individuals who are paid on a commission basis. *See* Consulting Agreement, § 1.05.

Mr. Mendenhall testified that between 2002 through February 2004, he produced business that exceeded $1.8 million.  For the period of November 2002 through April 2003, he received commission at the rate of 42.5%.  Beginning on May 1, 2003, his commission rate dropped to 25%. *See* Mendenhall Decl., ¶ 20.  On February 2, 2004, Mr. Mendenhall gave notice that he was resigning as a member of JTL.  Thereafter, JTL informed Mr. Mendenhall that he was required under the terms of the agreements he signed with them to repay the deficit in his capital account and the instant litigation ensued.

### C.    Contentions

Mr. Mendenhall contends that the oral agreement reached between him, Mr. Murphy and Mr. Brain, governs his relationship with JTL.   Under the terms of this alleged oral agreement, (1) Mr. Mendenhall was to receive a 42.5% commission rate for the entire time he was a member of JTL, (2) Lockton would pay all of the expenses (including draws) and

capital account deficits of JTL members during the first forty months of Lockton Georgia's operations, and (3) Mr. Mendenhall would not have to repay any deficit in his capital account.

JTL contends that the Operating and Consulting Agreements, as modified by the Additional Member Agreement signed by Mr. Mendenhall, are the relevant contracts. Any oral representations allegedly made by Mr. Murphy and Mr. Brain were merged into the other contracts through the merger clauses in the Operating Agreement and the Consulting Agreement. For the same reasons, JTL contends, Mr. Mendenhall cannot rely upon those statements to support a fraudulent inducement claim. Finally, JTL argues that the oral agreement alleged by Mr. Mendenhall is not enforceable because it violates the Statutes of Fraud. Under the terms of the contracts, JTL contends that Mr. Mendenhall owes $116,855.13 to repay his capital account deficit.

## II.   Discussion

### A.   Alleged Oral Agreement and November 2002 Additional Member Agreement

Under Georgia law,

[A] written and filed agreement may [] incorporate by reference . . . other documents by specific reference and identification so that such documents are treated as if a part of the document making the reference. As a matter of contract law, incorporation by reference is generally effective to accomplish its intended purpose where the provision[s] to which reference is made [have] a reasonably clear and ascertainable meaning.

See, e.g., Bowman v. Walnut Mountain Property Owners Association, Inc., 251 Ga. App. 91, 95 (2001).

The Recitals to the Additional Member Agreement state, "A. Company is governed by an Operating Agreement by which Member has agreed to abide and the parties have entered into a Consulting Agreement. B. With respect to Member, the parties desire to change certain portions of the Operating Agreement and Consulting Agreement." *Id*.   The Additional Member Agreement also specifies, "Except as provided above, the provisions of the Operating Agreement and the Consulting Agreement when applied to Member shall remain unaffected." *Id.*, ¶ 13.   Thus, the court finds (and Mr. Mendenhall never contests) that the Additional Member Agreement incorporates the Operating Agreement and the Consulting Agreement.

However, Mr. Mendenhall seems to argue that because he was not given the Operating Agreement and the Consulting Agreement at the same time that he signed the Additional Member Agreement, he cannot be bound by their terms.  The court disagrees.  In *Charles S. Martin Distributing Company v. Bernhardt Furniture Company*, 213 Ga. App. 481 (1994), a creditor filed suit for an amount due on an open account against a debtor and personal guarantor.  The court found that while the guarantor had not signed the actual "personal guarantee" form on page one of a document, he had signed page two entitled "addendum to personal guarantee."   The court rejected the guarantor's argument that he had signed the addendum, but did not see the guarantee until after he signed the addendum because the two documents were not attached to one another.  Specifically, the court held:

> [The guarantor] cannot avoid those terms by claiming that he failed to see the entire document he signed. There are few rules of law more fundamental than that which requires a party to read what he signs and to be bound thereby. It is well established that a party who can read must read, or show a legal excuse for not doing so, such as an emergency which excused his failure to read; or fraud of the other party not merely as to what is in the document, but by some trick or device which actually prevented him from reading it. The addendum signed by [the guarantor] plainly incorporated by reference the personal guaranty, which has a clear and ascertainable meaning. We conclude that [the guarantor] also had a duty to read the personal guarantee incorporated by the paper he signed. Because there is no evidence that [the creditor] prevented [the guarantor] from reading the personal guarantee and its addendum, or of any other legal excuse for [the guarantor's] failure to read, he is bound by his signature.

*Id.* at 482-83. The court finds *Charles S. Martin* clearly applicable to the situation here. Mr. Mendenhall testified that he asked about the documents, but he never requested that he receive the documents prior to his signing the Additional Member Agreement. No representative of JTL ever told Mr. Mendenhall that he could not have a copy of the Operating Agreement or the Consulting Agreement. Rather, Mr. Mendenhall's own testimony establishes that he just considered these documents to be "noise," and he did not care to understand the manner in which the draw operated, determinations Mr. Mendenhall could make at his own peril.

Mr. Mendenhall also contends that Mr. Murphy and Mr. Brain made certain assertions to him concerning the contents of the Operating Agreement and Consulting Agreement which caused him to rely on their statements and not seek out the documents themselves. This argument sounds in fraud, however, and is not a defense to the formation of the contract. The court addressed a similar situation in *Parrish v. Jackson W. Jones, P.C.*, 278 Ga. App. 645

14

(2006).   There, the purchaser of a mobile home and land filed suit against parties to the sale and the loan contending fraud and breach of contract.   The closing documents showed that the amount of the loan was $88,820 while the price of the land was $31,500 and the mobile home $58,500.   The purchaser admitted that he did not read the loan documents until three weeks after closing when he first developed the idea that the loan amount and price of the mobile home were excessive.   The purchaser claimed that prior to closing, he was told by an employee of the mobile home manufacturer that he could purchase the mobile home for $35,000.   He also asserted that a representative of the mortgage company told him that the loan would be for $75,000.   With respect to the plaintiff's fraud claim against the mortgage company, the court held:

> It is a long-standing matter of principle under Georgia law that a party to a contract who can read, must read or show a legal excuse for not doing so, and ordinarily *if fraud is an excuse, it must be such fraud as would prevent the party from reading the contract*.   One cannot claim to be defrauded about a matter equally open to the observation of all parties where no special relationship or trust or confidence exists.   Further, in the absence of special circumstances one must exercise ordinary diligence in making an independent verification of contractual terms and representations, failure to do which will bar an action based on fraud.   One not prevented from reading the contract, and having the capacity and opportunity to do so, cannot after signing it claim he was fraudulently induced to sign by promises which contradict the express terms of the contract.

*Id.* at 649-50 (quotations and citations omitted) (emphasis in original).   Because the purchaser had not read the loan documents, the court found that he could not establish reasonable reliance as a matter of law.   *Id.* at 650.   The court finds the same applies to Mr. Mendenhall.

15

Mr. Murphy and Mr. Brain clearly were not in a fiduciary relationship with Mr. Mendenhall such that he could rely on their assurances in lieu of reading the contract himself. Furthermore, Mr. Mendenhall has not asserted any facts that would allow a reasonable jury to determine that any representative of JTL prevented him from reading the Operating Agreement or the Consulting Agreement. (The court addresses further aspects of Mr. Mendenhall's fraudulent inducement claim below.)

The court holds that Mr. Mendenhall signed the Additional Member Agreement which incorporated by reference the Operating Agreement and Consulting Agreement. The court must now determine what impact the alleged oral agreement has on the later-signed Additional Member Agreement. In *Schwartz v. Harris Waste Management Group, Inc.*, 237 Ga. App. 656 (1999), the court considered plaintiff's claims that an oral agreement was formed precedent to a later-written agreement. There, Mr. Schwartz claimed that Harris Waste breached its contract with him when it failed to pay him a bonus upon the company's sale and did not award him severance pay when he was terminated. Mr. Schwartz argued that a December 16, 1994 letter was only evidence of an oral agreement between the parties, while Harris Waste asserted that the letter itself constituted an enforceable employment contract.

The court stated that it first had to determine whether the December 16, 1994 letter was a contract, and then it would proceed to consider whether the antecedent oral agreement merged into the subsequent written contract. The court found the 1994 letter was an

16

agreement.   It then stated that the "test to determine whether the oral agreement is one which

the law will permit to be [pled] and proved is whether the oral agreement constitutes a part of

the written contract or whether, instead, it is a separate and distinct, oral contract which is not

inconsistent with the written contract.   If the latter, it admits of pleading and proof."   *See* 237

Ga. App. at 659.   To decide the issue, the court "must determine whether the terms of the oral

contract contradict or vary from the terms of the letter.   If they do contradict the written

contract, then the oral agreement merges and the written contract prevails."   *Id.*

      Here, the court has determined above that the November 2002 agreement is a contract.

The parties have hotly contested the terms of commission set forth in the November 2002

written document as opposed to the alleged oral agreement.   Therefore, the court does not find

it difficult to determine that the terms of the oral contract vary from the terms of the written

contract.   Thus, the court concludes that the oral negotiations merged into the written contract

of the Additional Member Agreement.

      For the purposes of completeness of discussion, the court also notes that it is unlikely

that the oral agreement could stand on its own as a contract and render the later November

2002 contract invalid.

> To constitute a valid contract, there must be parties able to contract, a
> consideration moving to the contract, the assent of the parties to the terms of
> the contract and a subject matter upon which the contract can operate.   In
> analyzing whether an oral contract is sufficiently definite to be enforced, courts
> look to whether it is expressed in language sufficiently plain and explicit to
> convey what the parties agreed upon.   Although the law does not favor
> destruction of contracts on grounds of uncertainty, indefiniteness in subject

> matter so extreme as not to present anything upon which the contract may operate in a definite manner renders the contract void.

*Fay v. Custom One Homes, LLC*, 276 Ga. App. 188, 190 (2005). It is not clear that the terms Mr. Mendenhall asserts – (1) Mr. Mendenhall would receive 42.5% commission on revenues he brought to Lockton, but not in perpetuity; (2) Lockton agreed to pay all expenses for the first forty months of the Atlanta office's operations; and (3) these expenses included salaries, draws, air travel, expenses of the staff, and day-to-day account management – are sufficiently definite to constitute a contract. For example, Mr. Mendenhall testified that he, Mr. Murphy, and Mr. Brain had also discussed whether he would be paid a draw and/or a percentage of the profits of Lockton Georgia, but no agreement was reached as to these issues. *See* Mendenhall Depo., at 73-93.

Furthermore, such an agreement would run afoul of the Statute of Frauds. Agreements not to be performed within one year from their making must be in writing. *See* O.C.G.A. § 13-5-30(5). Under the terms asserted by Mr. Mendenhall, Lockton agreed to pay all expenses for the Atlanta office for the first forty months of its operation – outside the one-year time frame. Mr. Mendenhall argues that the Statute of Frauds does not apply to the oral agreement because Mr. Mendenhall partially performed under the agreement. It is true that under O.C.G.A. § 13-5-31(3), a contract can be enforceable outside the Statute of Frauds if there is part performance. However, part "performance required by O.C.G.A. § 13-5-31(3) to obviate the statute of frauds must be substantial and essential to the contract." *See, e.g.,*

18

*Ikemiya v. Shibamoto America, Inc.*, 213 Ga. App. 271 (1994).  The part performance must be "consistent with the presence of a contract and inconsistent with the lack of a contract.  Giving up another job, moving to a new location and beginning work are acts that are not inconsistent with employment that is terminable at will."  *Baxley Veneer & Clete Co. v. Maddox*, 261 Ga. 309 (1991).  *See also Ikemiya* (plaintiff's activities in traveling to Japan, facilitating sale of company to another company, finding office space for the new company, referring customers to the new company, and providing the new company with the previous company's client list were not "sufficient acts to establish part performance and remove this agreement from the statute of frauds because these activities are not inconsistent with employment terminable at will without a contract").

Contrary to Mr. Mendenhall's assertions, such an interpretation does not ignore all of the work performed by Mr. Mendenhall from July 2002 through November 2002.  Even if the court accepted the oral agreement theory proffered by Mr. Mendenhall, he was to be compensated on the basis of a percentage commission for revenues brought into Lockton by him.  There is no dispute that while Mr. Mendenhall worked to produce Centennial Health's business to Lockton through 2002, it was not until January 2003 when the first revenue from Centennial Health was received by Lockton.  Thus, whether operating on the oral agreement theory or the Additional Member Agreement theory, Mr. Mendenhall would not have been entitled to compensation until January 2003.  There is no question that Mr. Mendenhall has

been compensated for his work from July 2002 to the time of his resignation in February 2004.  Rather, the question is at which rate he should be compensated.[2]

**B.    Affirmative Defenses to November 2002 Contract**

In the alternative to the oral agreement alleged by Mr. Mendenhall, he also asserts that the court should not enforce the Additional Member Agreement, the Operating Agreement, or the Consulting Agreement because they are ambiguous and lack mutuality.

1.    Additional Member Agreement

The only argument Mr. Mendenhall makes with respect to the Additional Member Agreement is that it cannot be understood without the Operating Agreement or the Consulting Agreement.   Mr. Mendenhall does not cite any law for the proposition that this renders the Additional Member Agreement unenforceable, and the court has located none.   It is clear from the Additional Member Agreement that it is not a contract to stand on its own as it directly incorporates and modifies the terms of the Operating Agreement and the Consulting Agreement, thus requiring that the three documents be read together.

2.    Operating Agreement

---

[2]*Moreland v. Traffic Masters, Inc.*, 225 Ga. App. 244 (1997), cited by Mr. Mendenhall, is clearly inapposite as that case involved allegations of an oral employment contract only.   Nor does the court find persuasive, Mr. Mendenhall's assertion that the Additional Member Agreement fails for lack of consideration due to the fact that Mr. Mendenhall was already working to produce the Centennial Health business.   However, as JTL notes, the Additional Member Agreement provides (among other promises) that JTL would pay Mr. Mendenhall a $12,500 monthly draw, which serves as consideration.

Mr. Mendenhall contends that the court should decline to enforce the Operating Agreement for a variety of reasons. First, he asserts that the definition of Fee Income under the Agreement is ambiguous because it may or may not include fee overrides, which he describes as additional income based on the total amount of insurance business. Mr. Mendenhall contends that Mr. Murphy testified that overrides would be fee income, but Kimberly Augustine, Divisional Accounting Manager for Lockton Management, LLC, testified that overrides would not be income. Whether a contract provision is ambiguous or not, however, is a matter initially considered as a matter of law by the court looking only at the language of the contract. *See*, *e.g.*, *White v. Kaminsky*, 271 Ga. App. 719, 721 (2005) (first step in contract interpretation is for court to determine whether language is ambiguous; if it is not, court simply enforces contract by its terms). The Operating Agreement defines Fee Income as "any and all revenues of JTL." *See* Operating Agreement, § 2.1, at 3. The court does not find that this definition is ambiguous.

Mr. Mendenhall further asserts that the contract should not be enforced because the Executive Committee had the "unfettered right" to charge members for any expense or debt it deemed appropriate. He argues that this "unfettered right" renders the Additional Member Agreement illusory because the Executive Committee could write away his commissions by forcing him to pay expenses. The Operating Agreement sets forth that "all debits and credits to a member's capital account shall be made in accordance with the terms of this Agreement and certain policies established by the Executive Committee of each client." *See* Operating

Agreement, § 2.1, at 2.   The JTL Handbook also described various policies relating to expenses.[3]   The fact that the contract grants discretion to the Executive Committee to make these determinations does not mean the contract is incomplete or uncertain; rather, it means the parties to the contract agreed that the Executive Committee would have the authority to make these determinations.   Mr. Mendenhall contends that such "unilateral authority" renders the agreement unenforceable, but the case he cites for that proposition, *Lemming v. Morgan*, 228 Ga. App. 763 (1997), relates to whether an oral agreement was sufficiently definite, not whether one party was given "unilateral authority" over aspects of the contract.   Thus, the court does not find the Operating Agreement unenforceable due to the discretion vested in the Executive Committee.

Similarly, the fact that the Operating Agreement gives the Class A members of JTL the absolute right to determine each Member's monthly draw is not a provision that renders the contract unenforceable.   The parties bargained and agreed that the Class A members would have this authority.

Finally, Mr. Mendenhall disputes JTL's interpretation of certain provisions of the Operating Agreement, including (a) § 4.3(f) governing when a deficit in a Member's capital account can be considered a loan, (b) whether § 7.1(c) could be interpreted to mean that a

---

[3]Mr. Mendenhall appears to contend that JTL did not follow expense procedures set forth in the JTL Handbook.   This does not mean, however, that those provisions were ambiguous.   It rather serves as an argument by Mr. Mendenhall that JTL breached its contract with him.

Member does not have an obligation to restore a negative balance in a capital account, and (c) whether JTL follows the procedures set forth in § 9.3 governing the pro rating of a Member's fee income when a Member leaves during the year.  However, these are arguments concerning contract interpretation and do not speak to the enforceability of the contract itself.

       3.    <u>Consulting Agreement</u>

Mr. Mendenhall's only argument for why the Consulting Agreement should not be enforced is because he did not sign it and he was not provided with a copy of it when he signed the Additional Member Agreement.  As the court described above, however, the Consulting Agreement was clearly incorporated into the Additional Member Agreement.  If Mr. Mendenhall desired to know the contents of the Consulting Agreement prior to signing the Additional Member Agreement, he could have obtained and read it before signing the Additional Member Agreement.  The incorporation of the Consulting Agreement into the Additional Member Agreement does not render the Consulting Agreement unenforceable.[4]

---

[4]Mr. Mendenhall's complaint that JTL did not follow the directives of the Consulting Agreement to provide all administrative services and general overhead expenses is clearly a complaint for breach of contract and not against its enforceability.

4.      Separation from JTL

Finally, Mr. Mendenhall asserts that the manner in which JTL attempted to collect the debt on his capital account renders unenforceable the agreements Mr. Mendenhall signed.  He contends that two other individuals who gave up their membership in JTL, James Sehring and Tracy Spence, were not required to repay the debts in their capital accounts because existing producers agreed to absorb their deficits.  Mr. Mendenhall does not explain how these circumstances render unenforceable the agreements he signed.

Further, Mr. Mendenhall contends that because JTL initially calculated the amount owed on his capital account incorrectly, the agreement is unenforceable.  Again, this argument is made without citation and is without merit.

**C.      Mr. Mendenhall's Counterclaims**

1.      Fraudulent Inducement

The tort of fraud has five elements:  (1) false representation, (2) scienter, (3) intention to induce the plaintiff to act or to refrain from acting, (4) justifiable reliance, and (5) damages.  *See*, *e.g.*, *Markowitz v. Wieland*, 243 Ga. App. 151, 153 (2000).  The court addressed above the justifiable reliance aspect to Mr. Mendenhall's fraudulent inducement claim.  The fraudulent inducement claim also fails because Georgia law provides as "a matter of law, a valid merger clause executed by two or more parties in an arm's length transaction precludes any subsequent claim of deceit based upon pre-contractual representations."  *See*

24

*First Data POS, Inc. v. Willis*, 273 Ga. 792, 795 (2001).  The Supreme Court of Georgia further explained:

> Where a conflict exists between oral and written representations, it has long been the law in Georgia that if the parties have reduced their agreement to writing, all oral representations made antecedent to execution of the written contract are merged into and extinguished by the contract and are not binding upon the parties.   In written contracts containing a merger clause, prior or contemporaneous representations that contradict the written contract "cannot be used to vary the terms of a valid written agreement purporting to contain the entire agreement of the parties, nor would the violation of any such alleged oral agreement amount to actionable fraud."

*Id.* at 794-95 (citations omitted).  Because the court finds these rulings bar Mr. Mendenhall's fraudulent inducement claim, the court need not consider whether the same claim is barred because Mr. Mendenhall has not rescinded the contract.

### 2.    Breach of Contract

Mr. Mendenhall asserts that JTL breached its contract with him by failing to pay him commissions at a rate of 42.5% throughout the duration of his employment with JTL.  As the court found above, however, the oral agreement for 42.5% commissions alleged by Mr. Mendenhall fails and is not enforceable.  Similarly, Mr. Mendenhall's allegation that JTL was to pay the expenses of the Atlanta office for forty months also fails.  Instead, the Additional Member Agreement, incorporating the Operating Agreement and the Consulting Agreement, governs the terms of the parties' relationship.

Mr. Mendenhall also asserts that his agreement to enter into the "joint venture" with Mr. Noonan and Mr. Carlin on the Centennial Health deal should be voided because he made

25

the agreement under duress.   Mr. Mendenhall asserts that he felt pressure because of Mr.

Noonan's position in the company and because the Lockton Georgia office was not able to

provide him with the staffing necessary to service the needs of Centennial Health.   Under

Georgia law, duress consists of "imprisonment, threats, or other acts, by which the free will

of the party is retrained and his consent induced."   *See*, *e.g.*, *Cooperative Resource Center,*

*Inc. v. Southeast Rural Assistance Project, Inc.*, 256 Ga. App. 719, 720 (2002) (citing

O.C.G.A. § 13-5-6).

> "Business compulsion" or "economic duress" involves the taking of undue or
> unjust advantage of a person's economic necessity or duress to coerce him into
> making a contract and is recognized as a contractual defense.   A duress claim
> must be based on acts or conduct of the opposing party which are wrongful or
> unlawful.   Georgia courts are reluctant to void contracts, and we have found no
> Georgia decision voiding a contract on the theory of economic duress.

*Id.* at 720-21.   "[H]ard bargaining, by itself, cannot support a duress defense.   One may not

void a contract on the grounds of duress merely because he entered into it with reluctance, the

contract was very disadvantageous to him, the bargaining power of the parties was unequal, or

there was some unfairness in the negotiations preceding the agreement."   *Id.* at 721 (citing

*Tidwell v. Critz*, 248 Ga. 201 (1981)).   Neither of the reasons Mr. Mendenhall offers for his

duress rise to the level necessary under Georgia law.

3.      Unjust Enrichment/Quantum Meruit

Because the court found above that the parties' conduct was governed by the November

1, 2002 Additional Member Agreement and its incorporated Operating Agreement and

26

Consulting Agreement, Mr. Mendenhall's claim for unjust enrichment cannot stand. *See Kwickie/Flash Foods, Inc. v. Lakeside Petroleum, Inc.*, 246 Ga. App. 729, 730 (2000) (recovery in quantum meruit is not authorized when claim is based on express contract); *Mabry v. Pelton*, 208 Ga. App. 891, 893 (1993) (theory of unjust enrichment applies where there is no legal contract).

        4.    <u>Obligation in Contract/Breach of Implied Warranty</u>

Mr. Mendenhall claims that Mr. Murphy is obligated to him for the oral promises made concerning commissions and expenses. However, for the same reasons as found above, the alleged oral promises merged into the written November 1, 2002 Additional Member Agreement.

        5.    <u>Conversion of Website</u>

The allegations concerning conversion of a website are unclear to the court. Neither party addressed this issue in their statement of facts, and the court has no basis upon which to consider JTL's motion for partial summary judgment as to this claim.

27

### D.      Damages

#### 1.      Commission Rate

Under the terms of the Additional Member Agreement, Mr. Mendenhall was to be paid a commission of 42.5% from November 1, 2002 through April 30, 2003.   The Additional Member Agreement does not specify what rate of commission should apply after that date, so the provision for commissions in the Operating Agreement control after April 30, 2003. JTL has asserted – and Mr. Mendenhall has not disputed – that the Operating Agreement provides that the commission rate is estimated based on the office's budget for revenues and expenses and is then reconciled at the end of the fiscal year with the office's actual revenues and expenses.   JTL asserts that based on the provisions in the Operating Agreement, the appropriate commission percentage for Mr. Mendenhall after April 30, 2003, is 25%.   Mr. Mendenhall has not proffered any evidence to show this percentage is an improper application of the Operating Agreement.

#### 2.      Repayment of Deficit

Mr. Mendenhall asserts that under Section 7.1(c) of the Operating Agreement, he is not required to repay a deficit in his capital account upon his resignation from JTL.   Section 7.1(c) is contained in a section of the Operating Agreement entitled, "Liability and Indemnification."   Subsection (a) states that no member of JTL is liable for the debts of JTL unless he signed a personal guaranty.   Subsection (b) states that no member is required to use

28

his JTL capital to pay a creditor of JTL.  Subsection (c) reads, "except as otherwise provided

herein," a member does not have to pay back a deficit in his capital account.

JTL contends that subsection (c) relates to whether a member could be forced to repay

his capital account in order to pay off creditors of JTL.  JTL says that Sections 4.3 and 9.3 of

the Operating Agreement are the "otherwise provided herein" sections.  Section 4.3 states any

amounts distributed to a member in excess of the Fee Income earned by the member "create

an account receivable on the books of the Company and shall be regarded as a loan on which

interest may be charged to the Member.  Repayment of that loan shall be made out of future

Fee Income generated by the Member in excess of the approved Distributive Draw until the

entire account receivable is repaid." *Id.*  Section 9.3 states:

> <u>Payments Upon Termination</u>.  Upon termination of a Member's Interest . . ., any
> amount of Capital Contribution and any amounts due the Company . . . under
> this Agreement shall be paid to it . . . in full; provided, however, that the expense
> percentage used in the allocation of Fee Income generated shall be based on the
> actual revenues and expenses of the Client which is a signatory to the
> Consulting Agreement with such Member during the year of termination on a
> pro rated basis.

Operating Agreement, § 9.3.

The court finds that Section 7.1(c) relied upon by Mr. Mendenhall is limited to

Liability and Indemnification with respect to creditors of JTL and does not supplant the more

generally applicable sections 4.3(f) and 9.3 which provide that a member must repay amounts

owed on his capital account.  Therefore, section 7.1(c) is not a defense to having to repay the

capital account.  The fact that Mr. Mendenhall, Mr. Murphy, and Mr. Brain may have believed

that they did not have to repay deficits in their capital accounts is not relevant for the purposes of interpreting the contract.

3.  Accord and Satisfaction

JTL contends that Mr. Mendenhall's counterclaims for breach of contract are barred by the doctrine of accord and satisfaction.   JTL shows that each month, Mr. Mendenhall received a Producer Production Report which set forth the revenues generated by Mr. Mendenhall during the previous month.   Shortly thereafter, Mr. Mendenhall received a Monthly Recap of Member Activity spreadsheet with attached schedules.   The Monthly Recap documented the earned commissions and expenses from the previous month, the credits and charges applied to the capital account, and the balance (surplus or deficit) of the capital account.  The schedules showed how the commissions and expenses were calculated.

"An accord and satisfaction is an agreement between two parties to give and accept something in satisfaction of a right of action which one has against the other." *Withington v. Valuation Group, Inc.*, 249 Ga. App. 8, 11 (2001); *see also* O.C.G.A. § 13-4-103.  As with other contracts, there must be a showing that a meeting of the minds took place. *See*, *e.g.*, *King Industrial Realty, Inc. v. Rich*, 224 Ga. App. 629, 632 (1997).  In *King*, upon his termination from a real estate agency, a real estate agent received a memo indicating that his commissions would be reduced in accordance with his employment contract.   The agent responded that he did not believe the terms of the contract mandated the reduction and also contended that he was entitled to certain bonuses.   The agency responded again and pointed

to the contractual provisions upon which it relied.  The agent never responded and eventually cashed the reduced commission checks.  The court found there was no accord and satisfaction under these circumstances because there was nothing to indicate that the parties intended to settle their dispute.  Rather, the court found that the exchange of memos indicates only an agreement to disagree.  *Id.*

Here, there is no evidence that at the time Mr. Mendenhall received the monthly reports on commissions and expenses, he understood there was a dispute.  In fact, one of Mr. Mendenhall's primary disputes concerns whether he would have to repay a deficit in his capital account upon his departure from JTL, an event which obviously had not occurred at the time he received the monthly reports.  There is no language on the reports themselves which indicates that their mere acceptance by a member or a member's failure to contest the calculations in them would constitute accord and satisfaction on the part of the member. Therefore, the court finds that Mr. Mendenhall, like the real estate agent in *King*, did not waive his right to contest the amount of commission and expenses attributed to him simply by receiving the monthly reports.[5]

_____

[5]The court finds *Mobley v. Fulton Roofing Co.*, 173 Ga. App. 563 (1985), cited by JTL, to be inapposite.  There, the salesman met on numerous occasions with his employer to review the manner in which the employer calculated his commissions.  This included one final meeting in which he was presented with a document setting forth the calculations for his final commission check.  The salesman then "reluctantly" accepted this check.  *Id.* at 564.  The court accepted the company's testimony that it presented the final commission check to the salesman as payment for all commissions.  The events leading up to these meetings also demonstrated to the court that the salesman "accepted the check with at least a tacit

31

### E.     Summary

During briefing on the JTL's motion for partial summary judgment, the parties devoted most of their argument to the contractual basis for their respective claims.   In its rulings above, the court grants JTL's motion for summary judgment on its breach of contract claim, which renders moot its money had and received claim, as well as its unjust enrichment claim. JTL did not move for summary judgment on its claims for attorney's fees pursuant to O.C.G.A. § 13-6-11 and pursuant to a provision in the Operating Agreement.

JTL also moved for summary judgment on Mr. Mendenhall's counterclaims.   As a result of the court's rulings, the court grants summary judgment for JTL on Mr. Mendenhall's counterclaims of misrepresentation and fraud, unjust enrichment, obligation in contract, breach of implied warranty, and quantum meruit.   The court denied JTL's motion on Mr. Mendenhall's conversion of website claim for lack of information.   JTL did not move for summary judgment on Mr. Mendenhall's claim for attorney's fees pursuant to O.C.G.A.  § 13-6-11.   The court GRANTS IN PART AND DENIES IN PART JTL's motion for partial summary judgment.

The court now turns to the calculation of monetary damages.   JTL asserts that Mr. Mendenhall owes it $116,855.13 in capital account deficits.   JTL presented the affidavit of Stephanie Williams, Corporate Comptroller and Senior Vice President of Lockton

---

understanding that it represented all that the defendant owed him."   *Id.*   There are no circumstances here which demonstrate such a "tacit understanding."

32

Management, which attached the monthly reports Mr. Mendenhall received on commissions, expenses, and balance of the capital account.   Although not entirely clear, it appears that Mr. Mendenhall argues in his breach of contract counterclaim that he was improperly charged certain expenses and was improperly denied credit for certain commissions.   Neither party has squarely addressed these issues for the court.

Therefore, the court directs that within thirty (30) days from the date of this order, the parties either file motions for summary judgment on the remaining conversion of website claim and damages concerning the breach of contract, or file a pretrial order.

### F.      Motion to Compel

JTL filed a motion to compel with respect to Mr. Mendenhall's assertion of damages in his fraud claim through injury to his reputation and inability to procure employment.   JTL also requested documentation relating to Mr. Mendenhall's assertion that he was unfairly charged certain business expenses, including other producers' business expenses.   JTL has requested discovery on such items as income tax returns, compensation received from other employers, offers of other employment, and financial information related to companies Mr. Mendenhall started prior to his employment with JTL.   Mr. Mendenhall opposes the production of much of the requested discovery contending that he is not seeking damages for damage to his reputation or lost future wages.   Mr. Mendenhall further responds that he has agreed to produce any documentation concerning expenses he incurred while a member of JTL, but he has not been able to locate any to this point.

33

Because the court granted JTL's motion for summary judgment as to Mr. Mendenhall's fraud and misrepresentation claim, the court finds that JTL's motion to compel is moot. Further, because the court finds that the contracts between the parties govern the manner in which issues such as how expenses are to be handled, it is not necessary for JTL to discover Mr. Mendenhall's tax returns. Should any additional issues arise during briefing on damages, the court grants JTL leave to renew its motion to compel. The court DENIES AS MOOT JTL's motion to compel.

### G.    Motion for a Protective Order

At the close of discovery, JTL filed a motion for protective order with the court. That motion indicates that the parties had been unable to reach an agreement as to the scope and coverage of a protective order. Mr. Mendenhall responded to JTL's motion contending that such a protective order was no longer necessary as the parties had completed discovery, and no improper disclosure of any material deemed by JTL to be confidential had occurred.

The court agrees that the need for a protective order appears to be moot at this time. The parties have exchanged all discovery and filed dispositive motions. Furthermore, the court notes that even if the parties agreed in advance to classify information as "confidential" or "highly confidential," if the court were to rely upon it in ruling on any of the parties' dispositive motions, the court would determine it to be part of the public record of the case with no protections and no filing under seal permitted. Under these circumstances, the court DENIES AS MOOT JTL's motion for a protective order.

AO 72A
(Rev.8/82)

## III.    Conclusion

The court DENIES AS MOOT Plaintiffs' motion to compel [86-1]; DENIES AS MOOT Third-Party Defendants Sean Murphy and Lockton Companies, Inc., and Plaintiff JTL Consulting, LLC's   motion for a protective order [87-1]; GRANTS Third-Party Defendants Sean Murphy and Lockton Companies, Inc., and Plaintiff JTL Consulting, LLC's   motion for leave to file excess pages [94-1]; GRANTS IN PART AND DENIES IN PART Third-Party Defendants Sean Murphy and Lockton Companies, Inc., and Plaintiff JTL Consulting, LLC's motion for partial summary judgment [95-1]; GRANTS Defendant's motion for leave to file excess pages [107-1]; and GRANTS Third-Party Defendants Sean Murphy and Lockton Companies, Inc., and Plaintiff JTL Consulting, LLC's   motion for leave to file excess pages [112-1].

The court DIRECTS that within thirty (30) days from the date of this order, the parties either file motions for summary judgment on the remaining claim of conversion of website and damages concerning the breach of contract or file a pretrial order.

**IT IS SO ORDERED** this 20th day of March 2007.


_____s/ J. Owen Forrester_____
J. OWEN FORRESTER
SENIOR UNITED STATES DISTRICT JUDGE

AO 72A
(Rev.8/82)